```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4    CONSTELLATION TECHNOLOGIES,    )(

 5    LLC                            )(     CIVIL DOCKET NO.

 6                                   )(     2:13-CV-1079-RSP

 7    VS.                            )(     MARSHALL, TEXAS

 8                                   )(

 9    TIME WARNER CABLE, INC.,       )(     AUGUST 12, 2014

10    ET AL.                         )(     9:10 A.M.

11                        MOTIONS HEARING

12            BEFORE THE HONORABLE JUDGE ROY S. PAYNE

13              UNITED MAGISTRATE DISTRICT JUDGE

14

15    APPEARANCES:

16    FOR THE PLAINTIFFS  (See sign-in sheets docketed in
                            minutes of this hearing.)
17

18    FOR THE DEFENDANTS: (See sign-in sheets docketed in
                            minutes of this hearing.)
19

20    COURT REPORTER:    Ms. Shelly Holmes, CSR-TCRR
                        Official Reporter
21                      United States District Court
                        Eastern District of Texas
22                      Marshall Division
                        100 E. Houston Street
23                      Marshall, Texas  75670
                        (903) 923-7464
24

25    (Proceedings recorded by mechanical stenography, transcript
      produced on a CAT system.)
```

1                          I N D E X

2

3    August 12, 2014

4                                                Page

5         Appearances                            1

6         Hearing                                3

7         Court Reporter's Certificate           81

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LAW CLERK:  All rise.

2          THE COURT:  Good morning.  Please be seated.

3          For the record, we're here for the motion hearing in

4   Constellation Technologies versus Time Warner, which is Case

5   No. 2:13-1079 on our docket.

6          Would counsel state their appearances for the record?

7          MR. GILLAM:  Good morning, Your Honor.  Gil Gillam,

8   Bobby Lamb, Tom Werner, Zach Elsea, Ellisen Turner for

9   Constellation.  Also representative for Constellation, Alfi

10  Guindi seated on the back row back here.  We're ready to

11  proceed on all the motions, Your Honor.

12         THE COURT:  All right.  Thank you, Mr. Gillam.

13         MR. GARDNER:  Good morning, Your Honor.  Allen

14  Gardner, and here with me is Mr. Jonas McDavit, Karim Oussayef,

15  and we are ready to proceed, sir.

16         THE COURT:  Thank you, Mr. Gardner.

17         I will propose that we take up the motions in the

18  order that they were filed, unless there have been developments

19  that render another order superior.

20         Have -- does the -- either side have any suggestions

21  that it would be more efficient to proceed in another fashion?

22  If not --

23         MR. MCDAVIT:  No, Your Honor.

24         THE COURT:  Okay.  Well, then, we'll just take up

25  first the -- the motion for protective order that the Plaintiff

1    filed.

2         MR. GILLAM:  Good morning, again, Your Honor.  Gil

3    Gillam on behalf of Constellation.

4         I think it's important to point out at the very

5    beginning, Your Honor, this is not simply a rehash of the

6    motion for protective order which was filed earlier with the

7    Court that the Court has already entered a protective order in.

8    The infringement contentions of Constellation include

9    proprietary trade secret and confidential information, and we

10   have designated it as such.

11        I think what's important to understand here, as we

12   begin this discussion, is that the relationship between

13   Constellation and Time Warner Cable with respect to these

14   infringement contentions is this way.  Every time they have

15   asked us to share these contentions with anyone, we have

16   reached an accommodation with them.  Every time.  Whether it be

17   with their suppliers, whether it be with their vendors, whether

18   it be with their employees, whether it be with respect -- we

19   tried to reach an accomodation with respect to the matters

20   before the PTO.  We've always been able to do that.  That

21   apparently doesn't seem to be good enough for Time Warner Cable

22   in this case.  And so we're not exactly sure what their

23   intention is, but we've got some serious concerns about it.

24        What I think is important also to understand here,

25   Your Honor, with respect to the protective order is that in

1  looking at the case law of this district, I know they cite the

2  Fractus case, and we cite the case -- we also talk about the

3  case of Exit -- ExitExchange Corp. versus Casale Media, as

4  well.

5          What is before the Court today is different, we

6  believe, than what was before the Court in the Fractus case.

7  We don't know what was in that case in Judge Love's opinion.

8  We do know that he said in that particular case in looking at

9  the facts of that case that the information -- the contentions

10  were not entitled to protection.

11          In this case, Your Honor, we have brought evidence to

12  the Court -- the actual contentions, which were not before the

13  Court, by the way, when the Court actually entered the

14  protective order in this court.  So now the Court has those

15  contentions in front of it.

16          We've also brought a declaration of Mr. Powers in this

17  case which shows the technical analysis that had been done by

18  our client in this case.  It's not simply a situation where

19  some lawyers sat down in a room and looked over some documents

20  and figured out these contentions.  As Mr. Powers has put in

21  his -- in his declaration and which is used as proof in this

22  case, we've actually done a serious technical analysis which

23  has taken a lot of man hours by a lot of different people in a

24  lot of technical ways.  And so we believe that what is before

25  the Court today is simply -- we, again, don't know what was in

1   Fractus, but we do know that what the Court has today, we

2   believe, is different.

3          THE COURT:  And -- and I'm not too concerned about

4   prior opinions on fact sensitive matters like this.  But I -- I

5   know that the practice is to designate matters confidential

6   very broadly.  And it's -- it's done for a purpose that I

7   don't -- I don't have a problem with.  It just makes things

8   easier.

9          But when there is a challenge, then I think it's

10  incumbent on the Court to figure out whether or not the -- the

11  party making the designation can support it.  And I -- I read

12  Mr. Powers' declaration, and it -- it is difficult for me to

13  understand the trade secret aspect of this.  And I guess I --

14  I'm glad we're having oral argument so that maybe you can

15  enlighten me on that.  But I don't see how you can claim

16  something is a trade secret that you compiled for the purpose

17  of disclosure in litigation.

18         MR. GILLAM:  Let me turn to the declaration of

19  Mr. Powers if I can, Your Honor.

20         THE COURT:  Okay.  I've got it in front of me, too.

21         MR. GILLAM:  Undoubtedly, what was done is done for

22  the purpose of this litigation.  There's no -- there's no

23  dispute about that.

24         All I can say about that, Your Honor, is that with

25  respect to the -- to the effort that was made, with respect to

1   the technical analysis, it contains proprietary information of

2   this -- of this client with respect to the work that they've

3   done.  And, again, on a case-by-case basis, we do need to look

4   at it from that standpoint.  But as Judge Ward said in that

5   other case that I mentioned a few moments ago, there are

6   situations where the infringement contentions, as a general

7   rule, can be designated as confidential.

8           I don't know what other information that I can provide

9   to the Court other than the fact that if you look at the

10  extensive infringement contentions that were done in this case,

11  and I know we're going to address that in a few moments with

12  respect to another matter, but if you look at the effort that

13  was gone into with respect to these things, with respect to the

14  analysis that was done and how the analysis was conducted,

15  rather than just the analysis itself, and we can only rely upon

16  the declaration of Mr. Powers with respect to that, it shows

17  the effort that was done and how the analysis was done.

18          I don't know what other information I can give the

19  Court, other than what we have in that declaration as to -- as

20  to why it is -- it is proprietary and it is the trade secret of

21  our client.

22          THE COURT:  Well, it -- it is something -- it's my

23  understanding from the briefs -- I don't see this in the

24  declaration itself, but it -- I think everybody agrees that

25  these contentions were framed from examination of publicly

1    available information.  I'm not saying easily available, but

2    publicly available; is that right?

3            MR. GILLAM:  That's correct, Your Honor.  That's

4    correct, Your Honor.

5            Now, what I don't know -- and I, again, rely upon the

6    declaration of Mr. Powers with respect to that, I don't think

7    it is as easy as just simply saying there's public information

8    out there and you put it all together and out comes the

9    contentions.

10           According to Mr. Powers in the declaration he's

11   filed -- and then -- again, I would point the Court to the

12   contentions themselves.  It seems to be that it is an effort

13   which composed -- or it took a lot of man hours and a lot of

14   time to put these things together.  And so it is the analysis

15   itself perhaps rather than the -- the result of that analysis

16   which is -- is -- is of a concern to our client.

17           THE COURT:  Tell me, on that topic, the concern to

18   your client.  What is it that your client is concerned will be

19   done with this information that is damaging to your client?

20           MR. GILLAM:  I'll tell -- I'll tell the Court

21   specifically that.  We have several problems with it.

22           First of all, I go back to the point we made a few

23   moments ago, and that is with respect to -- because I think

24   this is important in this discussion.  With respect to the --

25   the disagreements between Time Warner Cable and Constellation

1   as to how this information should be used, every time they've

2   asked to give it to someone, we've said, okay, we'll work out

3   something with you to do it.

4        To be just brutally honest with -- with the Court

5   about this, what we're concerned about is that they're just

6   going to take it and publish it on the Internet, and that's

7   what's going to happen.  If it is published on the Internet, it

8   is published to all of our competitors that operate within the

9   same space that -- that we operate in.  And -- and that's

10  exactly what we're talking about here.  We have competitors in

11  the market for technology inputs.  They then have the benefit

12  of the analysis and how we did the analysis with respect to --

13  to all of this.

14       And so if that's what they're going to do with this,

15  then it's obviously a competitive problem with respect to ours.

16  That very issue was dealt with -- I think we attached a copy of

17  the transcript in that ZTE -- in that ZTE hearing that is a

18  part of -- a part of the record here.

19       So what happens is others that are involved in

20  licensing and developing in this market will be able to take

21  advantage of the labor that we've done.

22       THE COURT:  And how do they take advantage of that?

23       MR. GILLAM:  Because they have -- because they are

24  competitors -- direct competitors in the telecommunication

25  industry, they take the analysis that we've done, how we've

```
 1    done that analysis, and they take it and then use it, and they
 2    essentially have a free ride with respect to their attempts to
 3    sell within this same market.
 4          THE COURT:  Well, this analysis -- as I understand it,
 5    these are your -- your contentions as to how these Defendants
 6    have infringed your patent.
 7          MR. GILLAM:  That's correct, Your Honor.
 8          THE COURT:  So how do your competitors use that?
 9          MR. GILLAM:  Because, Your Honor, they -- again, I go
10    back to this particular point.  They take advantage of how we
11    do the analysis, how we put things together, how we -- how
12    we mark -- in other words, they'll take -- they'll take the
13    type of analysis we've done and how we put things together, and
14    they will see how we do our analysis.  And then they
15    essentially relay off that with respect to these other
16    competitors.
17          THE COURT:  Well, this is all something that
18    eventually will be shown to the jury at trial, right?
19          MR. GILLAM:  It very well may, Your Honor.  And, you
20    know, that may be a fight for another day.  In fact, when we
21    get up to trial, who knows what Time Warner Cable will be
22    saying about their technology.  We don't know if they'll want
23    to seal the courtroom.  But those are fights for another day.
24    We don't know.
25          I know they made an argument in their brief.  For
```

```
 1    instance, they said, well, if you go down this road of allowing
 2    Constellation to -- to -- to claim this as confidential, then
 3    they'll start claiming pleadings are confidential and all these
 4    other things.  Who knows what happens?  You know, he said, she
 5    said, would have, could have, should have, we don't know about
 6    those type of things.  We don't know.  We don't know what
 7    they're going to designate as confidential.  We have no idea as
 8    we go down those roads.  But that is a fight that we may end up
 9    having.  We don't know that at this point in time, but trying
10    to speculate as to what could happen in the future with respect
11    to this type of information, we don't know.
12            We're simply asking the Court to allow us to designate
13    these as confidential, allow us know what what's going on with
14    respect to who is seeing this information, and allow the very
15    basic level of -- of confidentiality.
16            I would make one other point with respect to the Court
17    on this.  You know, under the terms of the protective order
18    that we have currently entered, with respect to vendors,
19    suppliers, their employees, they're supposed to let us know who
20    they've sent this stuff to, who they've let see it.  To our
21    knowledge, they've shown it to no one.  No one.  Because we
22    don't have -- we don't have any idea who they sent it to so
23    far.  So we assume they're abiding by the protective order, and
24    they haven't shown it to anyone yet.  So what are they going to
25    do with it?
```

1          It seems to me, and it seems to us this is simply an

2     attempt to say, look, we want to make it broadly public so that

3     the public can use it for whatever purposes they want, and

4     they're not focused upon what they need it for in this

5     particular litigation.  And that's the concern that we have.

6     It just gets broadcast out there on the Internet publicly, and

7     we're harmed by that.

8          So that's basically what we have to say about it, Your

9     Honor.  And I'm happy to answer any questions the Court might

10    have.

11         THE COURT:  All right.  And I guess just so I'll be

12    clear, you talked about reaching accommodations when they've

13    asked to share this information in the past.  Those

14    accommodations are normally that you want to know who it is

15    that they're going to be showing it to and --

16         MR. GILLAM:  And -- and -- and that they will abide by

17    the terms of the protective order, yes, sir.

18         THE COURT:  Meaning that the people they show it to

19    would not show it to others?  Is that the --

20         MR. GILLAM:  Correct, Your Honor.

21         THE COURT:  -- basically it?  All right.

22         MR. GILLAM:  Correct.

23         THE COURT:  Okay.  Thank you, Mr. Gillam.

24         MR. GILLAM:  Thank you, Your Honor.

25         MR. MCDAVIT:  Good morning, Your Honor.  Jonas McDavit

1    for Time Warner Cable.

2              THE COURT:  All right.

3              MR. MCDAVIT:  I think Your Honor hit the nail on the

4    head with a couple of your questions to Mr. Gillam.

5              The fundamental issue here is when someone challenges

6    a designation or -- under your protective order, the person --

7    the proponent that these things should remain confidential,

8    that burden remains with the proponent.  And so what you're

9    hearing from Constellation is a lot of putting the cart before

10   the horse.  They need to come to Your Honor and show you why

11   and what in those -- in their infringement charts, which Your

12   Honor pointed out is going to be part of their case when this

13   comes to trial.  What in those charts deserves protection?

14   What is a trade secret under the protective order?

15             THE COURT:  Well, and I -- I agree with you on that.

16   I think that is their burden.  But I -- I do want to hear from

17   you also about obviously you've -- you want to share this.

18   Why -- what do you want to do with it?

19             MR. MCDAVIT:  Well, Your Honor, the protective order

20   that you entered in this case has restrictions on what both

21   parties, what the Court, what anyone can do with this

22   information.  It puts a burden on Time Warner to have to live

23   by those restrictions when we're talking about material that

24   isn't properly designated.  I can't -- I have to let

25   Constellation know exactly who I'm sharing it with.  I have to

1    insist that the PTO, which is a government agency, if I want to

2    share it with that -- with that agency, I have to tell them,

3    you know, excuse me, Patent Office, but you have to abide by

4    this protective order when I submit this information which will

5    be useful to you when performing your re-examination of -- of

6    certain patents.

7            Any time a -- information is designated in a case and

8    restrictions are put upon that information in accordance with

9    the protective order, it puts a burden on everyone in how it's

10   being handled.

11           THE COURT:  And I agree with that.  But tell me what

12   your intentions are with this if -- if the -- if we deny this

13   motion and find that these -- these contentions should not be

14   designated as confidential, then what is it that your side

15   intends to do with it?

16           MR. MCDAVIT:  Well, Your Honor, one of the things that

17   I think we're going to hear more about this -- in the remainder

18   of the motions, but one thing that we need to do is find out

19   from the people who work for Time Warner and the people who

20   work for our vendors, what they think of these contentions.

21   What is it that they have given us -- was it that we purchased

22   from -- from our vendors that they need to -- they need to do

23   their own investigation.

24           They -- they say that you can show it to your vendors,

25   but it's with restrictions under your protective order.  I have

1   to go to my vendors and say, you have to sign on to the

2   protective order.  They may need to talk to further engineers

3   that work for their vendors.  Maybe they have subvendors that

4   need to see this information to understand what the accusations

5   are.  Because the -- the contentions are -- are very broad, as

6   you've seen, and they involve dozens of products that Time

7   Warner Cable purchases from others.

8         So I don't plan to -- to post these on the Internet.

9   That's -- that's a straw man.  What I plan to do is to do my

10  investigation so that I can abide by the discovery rules in --

11  in this court and so that I can get the information we need to

12  bring the merits of this case into clearer focus.

13        THE COURT:  And -- and you don't -- what do you say to

14  their argument that there are competitors out there with them

15  who would benefit at their expense from seeing these?

16        MR. MCDAVIT:  I would -- I would say, first of all,

17  they've never identified any -- any so-called competitors.

18  Constellation is a non-practicing entity.  Their competitors

19  would be in -- in some sort of licensing market who would

20  presumably would have different patents with different claims

21  with different elements.  So there is no competitor out there

22  that as -- as far as we understand, and they've never told us

23  of any competitor that they would want Time Warner Cable not to

24  share it with.

25        If they did that and they wanted to put the burden on

the other side to say, well, we're going to remove the

confidentiality designation, you can share it with the Patent

Office, you can share it with your vendors, you can go out and

get the discovery you need for the purpose of this case, but

please don't post it on the Internet, and please don't show it

to Company X, Company Y, Company Z who may free ride, who are

also looking to license people in the cable industry, well,

then that would be a different discussion.  But they've tried

to flip the burden, Your Honor.  And when they try to flip the

burden, they're trying to protect information that's not

protectable and is not properly designated under the protective

order.

        And the only information that we have that the

information is a trade secret comes from the Powers

declaration.  And if you just beg my indulgence for a second,

I'd just like to walk through with Your Honor --

        THE COURT:  You don't need to because I -- I don't

believe that -- that these could qualify for trade secret

protection.

        MR. MCDAVIT:  And everything that Mr. Powers says

about those claim charts are the exact same thing I can put in

declaration to your -- you, Your Honor, about the invalidity

claim charts that we served Constellation in this case.

        THE COURT:  Well, Mr. McDavit, are you telling me that

you would make reasonable efforts to work with them if they

```
1    identify for you some specific concerns they have about

2    particular competitors getting these?

3           MR. MCDAVIT:  Absolutely, Your Honor.  If they

4    identify particular competitors that they don't want to -- to

5    have these competitors of Constellation who are in the market

6    of licensing to the cable companies, yes, Your Honor, I would

7    work with them.

8           THE COURT:  I also want to make the point that I do

9    understand that often in cases there's a fairly broad brush

10   approach to these designations, and that's something that you

11   have a right to challenge, and you are challenging here, but I

12   expect that as part of that, you will also understand that you

13   should not take a broad brush approach to designating materials

14   as confidential unless you think it's a defensible position

15   that they are.

16          MR. MCDAVIT:  Yes, Your Honor, I understand that.

17          THE COURT:  And your side will -- will abide by that,

18   as well?

19          MR. MCDAVIT:  Yes, Your Honor, Time Warner Cable will

20   abide by that.

21          THE COURT:  All right.  Then let me just --

22   Mr. Gillam, if you want to respond on this issue of

23   competitors, I guess what you can tell is I -- I have an

24   interest in protecting legitimate -- the parties from

25   legitimate harms, and I -- but I'm -- I have not heard anything
```

1    very specific for me to work with here.

2           MR. GILLAM:  Your Honor, with respect to the actual

3    analysis that was done, if it helps the Court some, Mr. Turner

4    that's seated here with us today can -- can provide some

5    additional insight with respect to that.

6           I will mention in direct response to the Court's

7    question, though, we simply don't know everybody in the tech

8    industry -- quite honestly, in the tech licensing market.  You

9    know, many of those folks keep their actions secret until they

10   file a lawsuit or seek licenses.  So we don't know who

11   everyone is out there.  And we're happy to work with them.  You

12   know, we -- we've even tried to reach out to them and say, you

13   don't have to tell us everywhere -- everyone that you're giving

14   this to, simply have them abide by the protective order, but

15   that seems to be something that they are unwilling to do in

16   this.

17          Now, as far as working with them, if they want to

18   identify people that they want to share it with, Mr. McDavit

19   says they want to -- you know, just do the discovery that they

20   need to do, we're happy to talk with them about who those

21   people are or people that come up in concern to ourselves.

22          But it's a matter of having these discussions before

23   the -- before the cow's out of the barn.  You know, once it's

24   out there, there's not a thing we can do about it.  So if they

25   talk about giving it to subvendors and all these other people,

1    and -- and it's not protected in some way, there's -- there's

2    not a thing we can do about it once that is done, if there's

3    not some protection there.

4            But as far as the Court's question about the analysis

5    that was done, Mr. Turner might be able to provide some more

6    insight to the Court on that.

7            THE COURT:  Well, I guess if he can provide insight

8    into the manner in which it could be used to the detriment of

9    Constellation, if it -- if other people get --

10           MR. GILLAM:  Certainly.

11           THE COURT:  -- ahold of it, that would be helpful.

12           MR. TURNER:  Thank you, Your Honor.  I'm Ellisen

13   Turner with Irell Manella.

14           So I and my team at Irell Manella work closely with

15   the folks at Constellation and Constellation companies in

16   developing this information.  The persons involved at

17   Constellation include their chief technology officer -- former

18   chief technology officer at Nortel, so she brought to bear 25

19   years of experience working in this technology.

20           The infringement contentions themselves contain our

21   theories on how Time Warner Cable's systems operate developed

22   with that knowledge, and that knowledge is -- was a Nortel

23   trade secret.  It's information that they derived working in

24   this industry and understand how networks similar to their own

25   work and how their competitors' networks work.

1          THE COURT:  S

2  o what you're telling me is that the information that would be

3  revealed is information about how Time Warner's systems work?

4          MR. TURNER:  It -- it certainly is information about

5  how Time Warner's system work that we derive based on public

6  information and our client's own industry knowledge about how

7  these networks work.

8          Neither of those two pieces are easily obtainable

9  based on public information.  It, as you saw in the

10  declaration, takes months of effort, tens of thousands of

11  dollars just for one claim chart.  So what would happen is if

12  the information was made public, there are others in the

13  technology licensing industry and markets for other technology

14  inputs, such as people selling trade secrets or licensing other

15  technology, they can take advantage of the knowledge that we've

16  developed about something that Time Warner itself does not make

17  public.  You cannot easily find out how Time Warner's systems

18  and networks work that are at issue in this case.  It takes a

19  lot of analysis.

20          If they see what we've derived, they'll be able to

21  take their own technologies, apply it to that, see what

22  direction we're headed in the technology markets and what we

23  are asserting our patents against and seeking licenses on and

24  try to head us off or use that information to their own

25  advantage in marketing their own technology with Time Warner.

```
 1   Neither is really palat -- palatable to us, Your Honor.  It can
 2   interfere with our existing licensing discussions if our
 3   analysis gets out and is used by our competitors in the market.
 4          THE COURT:  Well, why would Time Warner have an
 5   interest in affirmatively spreading this information about how
 6   their systems work that's not easily available to -- to the
 7   public?
 8          MR. TURNER:  I agree, Your Honor, and that's why
 9   I don't -- and I think we heard Mr. McDavit say that he's not
10   interested in making this information public.  There's specific
11   folks he wants to disclose it to, and we agree with that.  The
12   folks he wants to disclose it to are not competitors.  They're
13   his vendors, the folks that are asserting claims against
14   Rockstar and other venues.  So those folks, we've agreed, he
15   could disclose it to them, they just need to not make it
16   public, as well.  They know the specific set of vendors they
17   want to disclose it to, they know the specific employees they
18   want to disclose it to, and we've agreed to all of that so long
19   as those people keep it confidential and don't make it public
20   to the people who would actually be our competitors.
21          And the list they've got, we have no problem with.  So
22   I think that's sufficient to -- the protective order is all
23   about balancing harms versus burdens and prejudice.
24          We have submitted a factual declaration that will be
25   prejudiced and the ways in which we'll be harmed that has not
```

1  really been challenged by any factual recitation from Time

2  Warner.  There's no prejudice to Time Warner because every

3  single place that they want to disclose, we've agreed to work

4  with them and say you can disclose it to that place.  So really

5  there is absolutely no prejudice to Time Warner here if the

6  PICs remain confidential.

7        But an extensive amount of prejudice could potentially

8  result for my client, and we have no way to measure it at this

9  time, Your Honor, because we don't know who's going to get

10  ahold of it if they just broadly distribute it.

11        THE COURT:  All right.  Thank you, Mr. Turner.

12        I -- that's all right, Mr. McDavit.

13        I -- on the record that's before me, I -- I do not

14  believe that Plaintiff has carried its burden to show that

15  these contentions are entitled to protection as confidential

16  under the protective order.  I'm, therefore, going to deny

17  their motion and with a finding that those documents are --

18  should not be designated as confidential.

19        I will note for this record that I'm doing this in

20  part on the assurances of defense counsel that -- that their

21  desire is simply to use it -- use these documents for their

22  legitimate litigation needs, and I'm -- I'm relying on that,

23  but I do find that they should not be covered by the strict

24  terms of the protective order.

25        Let's move on to the motion to strike the infringement

1  contentions.

2      MR. MCDAVIT:  Your Honor, Jonas McDavit again for Time

3  Warner Cable.

4      My colleague, Mr. Oussayef, is going to hand out a

5  couple of slides that we have for -- to help walk through

6  the --

7      THE COURT:  All right.

8      MR. MCDAVIT:  -- this motion.

9      THE COURT:  Does the Plaintiff have these already?

10     MR. MCDAVIT:  We're getting that to the Plaintiff now.

11     THE COURT:  All righty.

12     MR. MCDAVIT:  Your Honor, before I get to the -- to

13 the slides -- and obviously, if there are any questions you

14 have, having read all the briefing -- I just want to make a

15 couple of fundamental points, which I think is going to apply

16 to both this motion and Constellation's motion to compel.

17     The first thing I wanted to make clear to the Court is

18 that this motion that we filed is not -- despite what you might

19 hear from Constellation, is not an attempt by Time Warner Cable

20 to unilaterally stay discovery in this case.  Rather, this

21 dispute is about one of the most fundamental disputes that we

22 have in a patent infringement case, and that is what are the

23 accused products in the case?

24     And every time we have tried to get information from

25 Constellation to tell us what the accused products are in this

1  case, we have been rebuffed.  Every time we have tried to

2  engage them in the scope of discovery in this case, we have

3  been rebuffed.  So this is a fundamental issue that -- that we

4  as -- as accused infringers need to -- especially right here at

5  the beginning of the case, just the beginning of discovery,

6  need to get clarity on so that we know going forward, what this

7  case is going to look like.  And so right now we don't have

8  that clarity.  So that was -- that was the first thing I wanted

9  to know.

10      All we have this moment, Your Honor, is what has been

11  charted by Constellation in its infringement contentions.

12  That's what we know.  That's what actually has been accused in

13  this case.  From that, we can go forward, and we can do an

14  investigation.  But we're trying to remove a broad set of

15  definitions from what is actually in their claim charts.

16      Again, this isn't about a unilateral stay of

17  discovery.  This is about trying to cut through unreasonable

18  and inconsistent positions taken by the Plaintiff in this case.

19  When you define things broadly in infringement contentions and

20  put them in -- as -- as Constellation has, and we produced

21  documents and then they turn around and say to us, you've

22  produced too many documents.  And then we say, okay, what do

23  you really want?  Well, we only want the relevant aspects of

24  what we've accused.  Okay.  I understand that.  That looks like

25  what you're talking about as your claim charts.  We're going to

1   go from there.  And then we get the response, no, I'm sorry,

2   that's not what we want.  We want more than that.  We still

3   don't know what's accused in this case after all of this, after

4   three months of going back and forth and trying to work with

5   them informally before having to bring this motion and the

6   pains that we have taken to try to get clarity before we bring

7   this motion.  That's where we are.

8            THE COURT:  Well, you know, Mr. McDavit, the -- the

9   perspective that I come with on this is that obviously these

10  contentions are early in a case, they are asserted before there

11  has been much discovery, that their function is to provide

12  notice, and there is no precise standard by which you can

13  measure the adequacy of them.  But looking at the contentions

14  that they filed, they appear, to me, to be in the range of what

15  I would expect in contentions in terms of their -- their level

16  of detail.  And I obviously am not familiar with the technology

17  like you are, but I guess what I need from you is some showing

18  that these violate the -- the rather forgiving standard that

19  exists at this stage of a case.

20           MR. MCDAVIT:  Absolutely, Your Honor.  And I think --

21  let's -- can we turn to --

22           MR. OUSSAYEF:  Push the button.

23           MR. MCDAVIT:  -- Slide 3, please.

24           There are three issues, and I agree with, Your Honor,

25  the -- with the fundamental precept that we've come at this

 1   with the idea that Constellation needs to provide us notice of

 2   what is accused in this case.  And obviously, when they filed

 3   their contentions, they had publicly available information as

 4   you just heard from -- from Constellation, and that's what they

 5   used.

 6        What we're trying to do is eliminate the disconnect

 7   that you see in the contentions between what they define as

 8   being the accused products and what they actually accuse as

 9   being accused products.  And that's the first issue that is in

10   our brief and I wanted to raise with you.  And this is the

11   issue of are we relying on, is our just -- is our -- the scope

12   of this case defined by the claim charts or is it defined by

13   their cover pleading which accuses all manner of things but

14   aren't -- there's no theories to back that up.  There's no

15   charts to back that up.  There's no one I can go to at Time

16   Warner Cable to say, tell me how this works, because it is so

17   amorphous.

18        And what we're trying to protect against, Your Honor,

19   is that if their infringement theories change if they have new

20   products that they want to accuse, that they're not relieved of

21   their duties under the local rules to amend their contentions

22   when that -- if and when that happens.

23        Can you turn to Slide 6, please?

24        I -- with -- with your -- the Court's guidance in

25   mind, what we try -- what we tried to do in our briefing and I

1    think we've tried to do here in these slides is point out the
2    difference between what you see as the accused
3    instrumentalities as they are defined in the -- in
4    Constellation's cover pleading on the left and what is actually
5    in the claim charts that are on the right and the difference
6    between the two.
7            And if you look at the next slide, Slide 7, I think
8    it's the clearest when you look at the '879 patent.  The '879
9    patent, what they say is accused, the accused instrument --
10   instrumentality of these cases points to multipoint access
11   networks.  There's no engineer at Time Warner Cable that -- who
12   is responsible for point-to-multipoint access networks.
13   There's no one I can go to to find out about
14   point-to-multipoint access networks that literally encompasses
15   any network if read as Constellation appears to -- to read it,
16   encompasses all of Time Warner Cable's network.
17           What they have actually charted -- what their theories
18   appear to be with respect to the specific patent and the
19   specific claims have to do with what is called ethernet based
20   passive optical networks which is a specific type of network in
21   which services may be provided over and Time Warner Cable's
22   whole-house entertainment networks.  That is something specific
23   I can look at.  I can go to Time Warner Cable and find out more
24   about.
25           And if you look at Slide 10, please.

 1          This is just going to that same exact point.  There

 2  is -- point-to-multipoint could conceivably relate to any

 3  network where you have one node talking to more than another --

 4  one other node.  If you look at their charts, which is the next

 5  slide, this is what they have told us infringes.  And we're

 6  trying to remove that disconnect, Your Honor, and that's what

 7  the first issue is with their motion to strike.

 8          And, again, if you look at Slide 13, I try to

 9  graphically represent it.  The difference between what is

10  ostensibly accused in their cover pleading and what is actually

11  charted in their charts is huge, and we're just trying to get

12  clarity over what this case is about.

13          So with the -- with the Court's guidance in mind about

14  the notice function of -- of infringement contentions, we're

15  saying for the first issue, we don't take issue with what's in

16  the charts necessarily.  The charts are -- say what they say.

17  The theories are what they are.  We're trying to get clarity

18  over what the products are that are encompassed by that chart.

19  And every time we've asked them, they say, well, we don't want

20  everything, we don't mean everything, but they won't tell us

21  what exactly they want beyond the charts.

22          THE COURT:  All right.  Well, let -- let me give them

23  an opportunity here to respond to this specific argument, and

24  then I'll give you a chance to get back up.

25          MR. MCDAVIT:  Yes, Your Honor.

```
 1              MR. TURNER:  Thank you, Your Honor.  Ellisen Turner
 2  again.
 3              I'll address each of the points that Mr. McDavit has
 4  made thus far.
 5              First, Your Honor, was the mention of whether or not
 6  this relates to the need for Time Warner Cable to provide
 7  discovery and their efforts to withhold certain discovery thus
 8  far.
 9              THE COURT:  Well, why don't -- why don't we save that,
10  and just at this point, it would be most helpful to me if you
11  can just respond to the issue that he's raised here about the
12  accused and charted instrumentalities and what he perceives as
13  an inconsistency between the two different pleadings.
14              MR. TURNER:  Yeah.  Your Honor, there's no
15  inconsistency.  So what we've explained to Time Warner multiple
16  times since they first raised this issue and that was first
17  raised three months after they received our infringement
18  contentions on -- they first raised these new issues on June
19  18th.  Since they raised the issue, we explained to them that
20  each of the accused instrumentalities listed in the cover
21  pleadings, which is a broad definition that Mr. McDavit was
22  referring to, each of those instrumentalities and the charts
23  they're complaining about in our understanding, based on
24  everything we know so far, function virtually identically with
25  respect to all of the elements listed in the claim chart.
```

1          So as Your Honor has held in prior cases, as multiple

2    judges in this court have found, there's no need to chart

3    separately multiple instrumentalities that function virtually

4    identically.  The charts themselves lay out the aspects of

5    those instrumentalities that are at issue, provide examples of

6    how they work in an infringing way, and whether it's EPON or

7    some other name that Time Warner internally decides to call its

8    point-to-multipoint networks, under all their code names, Your

9    Honor, if they function the way laid out in our claim charts,

10   those are accused of infringing, and that's our theory, and

11   that's what we're obligated to disclose.  So we've done exactly

12   what the patent rules require in that regard.

13          Oftentimes, Your Honor, you see a patentholder say,

14   it's what's in the charts and anything else like it.  Well, we

15   went beyond that.  We did our best to scour public information

16   and determine what Time Warner itself called these things, and

17   we named those in our cover pleading and said examples of how

18   they infringe are provided in the chart.  So they have

19   everything they need to understand our infringement theory for

20   every one of their products.

21          I'll address the over breadth argument, Your Honor.

22   The argument is that, well, point-to-multipoint, that can cover

23   everything that Time Warner uses, all of their networks and

24   services.  Your Honor, it may.  That's true.  I have no idea

25   whether it does or not, but it may.  And, Your Honor, I

```
 1   analogize it to a case where if my client had patents on
 2   windshield wipers and car batteries and we were suing Ford
 3   Motor Company, I would say, Ford, every single one of your cars
 4   is at issue here.  That doesn't mean I need documents on your
 5   tires and the engines in the cars, but every single one of your
 6   products is going to be at issue, and it would not be
 7   appropriate for Ford to respond, well, gosh, you're saying that
 8   everything infringes, that's too much discovery for us to
 9   provide, so you got to take some of those out of the case.  It
10   can't be Mustangs and F-150s.  You got to limit it to the Ford
11   Focus.  That's just not right.
12           If our patents cover something that's intrinsic to all
13   of Time Warner's networks, then that's what's in the case, and
14   that's -- if that's the case here, I haven't seen anything
15   factually from their client to indicate what Mr. McDavit is
16   saying is accurate.  And I don't think Your Honor will see
17   anything like that because as they've admitted, they haven't
18   even begun to investigate our infringement contentions with
19   their client, although the protective order permitted them to
20   do that.  They haven't even discussed this with the Time Warner
21   engineers to determine if the Time Warner engineers themselves
22   understand very well what we have accused and all aspects of
23   it.
24           So, Your Honor, I think there was really no issue
25   here.  We've done what the patent rules require.  We've
```

1   provided our infringement theory.  That theory addresses all of

2   the instrumentalities in our -- in the cover pleading, and

3   we've explained to them why.  What we have never heard to this

4   day from Time Warner is any question about what are our actual

5   infringement theories are for any network.  Whatever their

6   point-to-multipoint networks are, the infringement theory for

7   those networks are in our claim charts.  They've never

8   questioned that theory, so we've done exactly what the patent

9   rules require, Your Honor.

10          THE COURT:  All right.  Thank you, Mr. Turner.

11          MR. MCDAVIT:  Karim, can you go to Slide 9, please?

12          Your Honor, what I'm hearing correctly from Mr. Turner

13   is that their theories -- infringement theories are in their

14   claim charts, then the relief that we're asking from Your Honor

15   is to strike the identification of accused instrumentalities

16   that you see on Slide 9.  If their theory is what is in their

17   charts, then we will -- and we have -- and, in fact, we -- I

18   don't know what Mr. Turner is referring to to say that we

19   haven't done our investigation, but I can tell you point of

20   fact that we have met with -- with several Time Warner Cable

21   engineers to do investigations about what's in their charts.

22          What I would like to have stricken and what Time

23   Warner Cable is requesting in its briefing is the

24   identification of accused instrumentalities that are inside of

25   its 3-1 cover pleading that you see here on Slide 9 where it

```
 1   just broadly accuses point-to-multipoint access networks.  If
 2   their theories are limited to what's in their charts and
 3   Constellation is willing to -- has made that affirmation, is
 4   going to live by that, then maybe we don't have a dispute.  I
 5   just want to remove the disconnect between the over breadth of
 6   what is in their cover pleading and what is in their actual
 7   infringement charts.
 8          We've never refused to provide discovery of the
 9   instrumentalities that are actually charted.
10          And if the Court doesn't have any other questions, I
11   can move on to the second issue.
12          The second issue, if you go back to Slide 3 again.
13          Two of the charts that are at issue in this case have
14   to do with what Constellation broadly calls Time Warner Cable's
15   video services.  The problem we have with these particular
16   charts is for the '649 and '299 patents is that the charts do
17   not show -- though they accuse four separate products, they do
18   not identify infringement theories as to how each of those
19   products work.
20          Now, Constellation may come up here and say, our
21   theories are all -- are all on the charts, and we're standing
22   by what's in those charts.  They may say that, Your Honor, and
23   if that's the case, then perhaps there's no dispute.  But if
24   you look at the charts themselves, what you'll find -- and,
25   again, we tried to -- to do this graphically in both the
```

1    briefing, and I'll try to do it again here, if you go to Slide

2    28, they identify four different products, and we've tried to

3    color code them on the slide, and we did the same in the

4    briefing that we sent to Your Honor.  But in their charts, they

5    do not explain how each of these systems infringe or meet the

6    elements of the asserted claims.  So we are left to guess as to

7    what their theories are.  And we are not put on notice as to

8    what their theories are about these four very different

9    products.

10           And if you go to the -- Slide 29, I just took -- took

11   an example of one of the claim elements.  This is taken right

12   from their charts.  They have examples as to -- to explain how

13   each of these products infringe.  In -- in theory, they

14   infringe because they meet the claim elements because of

15   something that they do that they discovered when they created

16   these charts.  But if you look at this one -- I'm just -- pick

17   one claim element here, they only mention two of the

18   purportedly accused four different video services.

19           If their theory covers -- and they have examples of

20   how each of these very different services meet the elements of

21   each of these claims, I'm not asking them to provide redundant

22   charts, if they say that these charts are -- this is the

23   theories we're sticking with, and we are -- you know, we think

24   that these charts all meet because they -- all SDV service

25   networks or all VOD, Video-on-Demand, networks infringe the

1    same way as the switched digital video service does because it

2    has these types of policies in them, well, that's one thing.

3    But I don't think that's what's going on here, Your Honor.  I

4    think, again, this is a placeholder chart that is meant to

5    protect Constellation so that it doesn't have to move to amend

6    if and when its infringement theories change or if and when it

7    wants to add new products.

8            And the first time I don't -- I see what their

9    infringement theories are, I don't want to be in their

10   infringement expert's expert report.  I'm trying to get

11   clarification as to why they think each of these four products

12   meet each of the elements of the -- of the claims.

13           THE COURT:  Aren't they going to be held to these

14   theories in the future if they don't amend them?  Isn't that

15   the answer?

16           MR. MCDAVIT:  Your Honor, if -- if that's the case,

17   and they're going to be held to these theories throughout

18   the -- the entire time of the case, then perhaps, again, I

19   don't have an issue.  But what I don't want to have is a fight

20   six, eight months down the road where we see different

21   infringement theories in their expert reports, and we're doing

22   this fight all over again.

23           THE COURT:  All right.  Well, let me hear from

24   Mr. Turner.

25           MR. TURNER:  Your Honor, I just heard several times

```
 1  that what Time Warner would like stricken is the list of --
 2  portions of the list of accused instrumentalities in our cover
 3  pleading.  That's essentially a motion for summary judgment,
 4  Your Honor.  Our theories are provided in the charts for why
 5  products infringe, and they're actually instrumentalities here
 6  because they're networks and services.  But our theory as to
 7  why those instrumentalities infringe are provided in the
 8  charts.  The set of instrumentalities that meet those theories
 9  are in the cover pleading, and there's nothing at all wrong
10  with that because we have said time and time again where
11  they're not specifically charted, our belief is they function
12  virtually identically to what is there, and there's -- there
13  are decisions from Your Honor that say that is exactly what
14  you're supposed to do in cases where multiple items function
15  virtually identically.
16          What we don't have is any statement from Time Warner
17  saying, hey, wait a minute, some of these things you have in
18  your cover pleadings don't function that way.  No factual
19  statement from them in that regard at all.  We have no reason
20  to believe that -- that we're wrong in this regard, that all of
21  these things function identically.
22          And, Your Honor, if we are wrong, Your Honor is
23  absolutely right, that would be the time to amend our
24  contentions and say, oh, well, this functions differently, and
25  if we have a theory of infringement on that, boy, we better
```

```
 1   seek to amend or we're going to be stuck with the theory in our
 2   charts.  We recognize that, and we'll comply by the -- with the
 3   law and the rules regarding that, Your Honor, so there's no
 4   fear.
 5           THE COURT:  Addressing this chart that's up on the
 6   screen now, Chart 29, the fact that the Video-on-Demand and
 7   video conferencing services are not specifically called out in
 8   that -- in that portion of your disclosures simply should be
 9   read as meaning that you understand that the -- those
10   particular instrumentalities function in the same way as what
11   you have called out?
12           MR. TURNER:  That's correct, Your Honor.  In fact,
13   very few of the -- this isn't true for all the patents, but for
14   a very few of the patents, it doesn't matter what specific type
15   of data is traveling over the network.  It has to do with how
16   that data is handled and how network failures are efficiently
17   managed, so the distinctions they may have amongst their
18   networks and services based on whether they're serving
19   businesses or consumers, whether they're serving video or video
20   games, those are distinctions for the most part that matter.
21   And where they did matter, we set that forth in our claim
22   charts.
23           THE COURT:  All right.  Thank you, Mr. Turner.
24           MR. MCDAVIT:  Your Honor, Jonas McDavit again for Time
25   Warner Cable.
```

1          The -- a cursory look at what Time Warner Cable

2   provides as services would let someone know that these services

3   do not function the same way.  If they're going to be held to

4   these charts the whole way through until they -- until and if

5   they move to amend them, then -- and their theories are what's

6   crystallized in their claim charts, then, you know, that's --

7   that's one thing.

8          Again, we're trying to prevent against the mischief

9   that we often see where these theories are so malleable that

10  they could fall within whatever scope of whatever expert report

11  they intend to provide later in this case.

12          THE COURT:  All right.  Well, I understand your

13  concern, Mr. McDavit.  I think that I'm going to deny the

14  motion to strike.  I -- I believe that their contentions are --

15  at least with respect to the parts that have been drawn to the

16  Court's attention as a result of this motion, their contentions

17  are sufficient.

18          And certainly it is the expectation of the Court and

19  the practice of the Court that they'll be held to these unless

20  and until they're amended.  And so we'll -- if there are -- if

21  there's future mischief, we'll have to deal with that when it

22  occurs.

23          MR. MCDAVIT:  And -- and that would include also

24  the -- the Doctrines of Equivalents, sort of boilerplate

25  placeholder statements that we see in their charts, Your Honor?

1          THE COURT:  You know, I -- I -- my attitude toward

2    such things has always been not to strike things that are

3    deemed to have little or no real effect simply because lawyers

4    are genetically wired to include those things.  And I -- if I

5    start granting all the motions to strike things that aren't

6    necessary, I would be covered up with motions to strike.  If

7    you can identify for me a harm that -- that that is doing to

8    you, then that's something that I'll -- I'll address, but

9    otherwise, the mere fact that it is in effect surplusage is

10   just not something that --

11          MR. MCDAVIT:  Yes, Your Honor.  And I understand that.

12   I -- my -- my concern, again, is I don't want to see the first

13   time that they have a Doctrine of Equivalents theory for

14   anything in this case about why something doesn't literally

15   infringe but infringes by the Doctrine of Equivalents is -- is

16   reading their expert reports.  If they have a theory that comes

17   up during discovery, then there is a process by the local rules

18   on how to address that.  And so I just want to make sure that

19   we're all on the same page here as to that process will be

20   followed if and when such an issue comes up.

21          THE COURT:  All right.  Let -- let me let Mr. Turner

22   address that or his side.

23          MR. TURNER:  Not much so say, Your Honor.  I agree

24   with you.  Our current Doctrine of Equivalents theories are

25   disclosed in the cover pleading and in the bodies of the claim

charts.  And if we find out we're wrong, especially after

reviewing whatever reasons they may have for non-infringement

and, of course, after claim construction is done, we'll have to

seek to amend if we have some different or more expansive

theory.

          THE COURT:  All right.  Thank you.

          With respect to the Doctrine of Equivalents issue,

I -- I'll just say that -- that the Court will agree with the

Defendants' argument that the expert report should not be the

first time that the Defendants see the basis for the -- for the

argument under the Doctrine of Equivalents, and that I would

expect that Plaintiff will avoid that concern coming to pass.

But I will deny the motion as it's currently framed.

          With respect to the motion to compel, let me see,

first off, has there been any progress on -- on the scope of

that motion?

          MR. TURNER:  I think there has been some, Your Honor.

With respect to source code, there's been an agreement on the

source code location.  It's the Kay Schiller law firm location

in Century City, California, across the street from my own

offices, so we've got that settled.

          My understanding from Time Warner is that they are now

saying in their reply brief that they're not going to limit

their production of source code or other documents based on the

contentions they made in their motion to strike.  I think now

1    that it's been denied, that would be a moot point anyway.  The

2    products that we've accused are in the case, so they'll provide

3    that source code without any limitation on the scope of what we

4    asked for.  So I think that portion would be resolved by your

5    ruling today, as well as agreements.

6         With respect to the document production -- so there's

7    a request for production of documents under PR 3-4(a)

8    sufficient to show the accused instrumentalities.  Again, Your

9    Honor, I believe your rulings today would prevent Time Warner

10   Cable from limiting the scope of its document production based

11   on its view of Constellation's infringement contentions and

12   would include the relevant aspects of all of the accused

13   instrumentalities there.

14        We had a letter from Time Warner Cable -- I believe it

15   was last night, perhaps the night before -- that said that

16   based on a cursory review of their own production, they were

17   able to easily identify documents relevant to the accused

18   instrumentalities pursuant to some categories that we sent

19   them.  I think that shows that at least they can provide the

20   correlation that we've asked for.  I don't think they have

21   agreed yet that they will.

22        I don't think we've reached any resolution on the

23   30(b)(6) deposition notice served about two months ago.  We

24   still don't have a witness on that or a date for that

25   deposition.  I believe that was all the issues in the motion,

1    Your Honor.

2            MR. MCDAVIT:  Your Honor --

3            MR. TURNER:  Oh, I'm sorry, and there were

4    interrogatory responses, Your Honor, where we had asked for

5    specific information about certain components used throughout

6    the accused networks.  I don't think we've reached any

7    resolution on that yet either, Your Honor.  And I'm happy to

8    argue any of those issues first or if you want to hear a

9    response to that particular portion.

10           THE COURT:  I'd like to hear a response as to what has

11   been resolved and what still remains.

12           Mr. McDavit.

13           MR. MCDAVIT:  Yes, Your Honor, I'll agree with

14   Mr. Turner that in terms of the location of the source code

15   review, the parties have worked that out.

16           But I disagree that the motion to strike and Your

17   Honor's basis for doing so and the arguments that we've heard

18   from Constellation throughout that -- the past -- I've already

19   discussed that, changes fundamentally the -- the overarching

20   dispute and concern that we have and we expressed in our

21   briefing with regards to the scope of discovery in this case

22   and -- and our efforts to -- to engage in discovery in this

23   case.

24           THE COURT:  Well --

25           MR. MCDAVIT:  I mean, I don't know how you want to go

1   forward, Your Honor, with -- with the individual motion or

2   different points.  It's Constellation's motion, so I can let --

3   they can go and tell you why they need this stuff.

4          THE COURT:  Tell me where you are on this 30(b)(6)

5   deposition issue.  I understand you've been served with the

6   notice.  What position are you taking regarding your obligation

7   and response to that?

8          MR. MCDAVIT:  Yes, Your Honor.  The 30(b)(6) notice,

9   we have, as Time Warner Cable, have not refused to provide a

10  witness.  That is a misrepresentation of fact.  What we said

11  was if the 30(b)(6) witness and the topics that are -- that are

12  supposed to be addressed in the 30(b)(6) witness are where you

13  store documents, then we've -- we're not done with our

14  production.  We're continuing our investigation, as we've told

15  them time and time again over the products that are in their

16  infringement theories that are in this case.

17         So it makes no sense to provide a witness if each time

18  I produce documents I'm going to get the same 30(b)(6)

19  deposition.

20         Second thing was is that if there's a -- if this

21  witness who knows where the documents are is also a technical

22  person that they're going to want to speak to on technical

23  matters, we thought prudently it makes sense to go forward in

24  discovery where those topics about where documents are located

25  and whatever they're going to want to ask about the -- the Time

1    Warner systems are done at the same time, rather than having an

2    engineer who has another job other than to give depositions for

3    lawyers to -- to sit multiple times to answer -- to answer

4    questions when I can resolve those things at -- at one time.

5          So I think the discussion that was never completed

6    before Constellation filed its motion was what is the best way

7    to go forward in discovery, and the -- the other overarching

8    issue, as we have been discussing, is if I put a witness up and

9    he's going to talk about what is in -- what the accused

10   instrumentalities are and what the infringement theories that

11   Constellation's laid out in their claim charts, I don't want to

12   be told later that, well, you didn't provide enough, and I have

13   to -- we're going to wind up back here, Your Honor, in talking

14   about why someone wasn't sufficiently prepared.

15         So in -- in a sense, what -- the issue is whether or

16   not we're even at a place in this case that it makes sense to

17   go forward with that deposition.

18         THE COURT:  Well, I mean, I think your protection is

19   that if they choose to take a 30(b)(6) deposition on certain

20   topics at a time that is inappropriate for it, that they'll

21   suffer the -- the prejudice of having picked the wrong time.

22   But I -- I don't think that the Defendant is entitled to say, I

23   don't want to give you that discovery at this time because I

24   think you'll be better off if you wait.  Obviously, you have a

25   legitimate point that you shouldn't be subjected to having same

1  topics explored over and over, but I think that protection for

2  that is that it won't happen if you object.

3       So my understanding is the Plaintiff wants to have

4  these topics explored at this time, and I -- I think that your

5  response to that is you need to designate the people who are

6  the best spokesmen for your company on those topics at this

7  time.

8       MR. MCDAVIT:  Yes, Your Honor.  And -- and the -- the

9  only things I would say in response, obviously, to that we

10  can -- we will put up a witness is I don't -- my -- my concern

11  is, again, bringing someone back multiple times on the same

12  topics.  And second is I don't want -- and this is going to --

13  I think this is what Mr. Turner alluded to earlier when he was

14  speaking to Your Honor about the scope -- the scope of

15  discovery here and the products that are accused and the

16  infringement theories that are accused in this case, if

17  those are truly defined by what is in their claim charts, as

18  Mr. Turner has said, those are the theories that they're going

19  to run forward with, then I can prepare a witness to address

20  those, but if it's -- what I haven't heard from Constellation

21  is something that says, we are interested in finding out about

22  where you keep documents specific to how products work as

23  defined in our -- as the theories expressed in our claim

24  charts.  If that's the scope, I can -- I can go ahead and do

25  that.  But if I provide a witness, what I'm worried about and

```
 1   as I expressed, is that there is no bound.  There's no way for

 2   me to effectively prepare a corporate witness to be able to

 3   testify if they are allowed free reign on -- in the -- with the

 4   full breadth of what they have said is accused in their cover

 5   pleading.

 6           THE COURT:  All right.  I just want to make sure I'm

 7   understanding your issue.

 8           MR. MCDAVIT:  Uh-huh.

 9           THE COURT:  Does is have to do with the way a topic

10   has been worded regarding the storage of documents?

11           MR. MCDAVIT:  Yes, Your Honor.

12           THE COURT:  What's that topic?

13           MR. MCDAVIT:  And so let's -- I'll -- let me go to

14   Slide 58, please.  This is one example.

15           I'm sorry, this is -- I'm sorry, this is from the --

16   from the interrogatories, but they have similar definitions in

17   their interrogatories as they do in their 30(b)(6) witness --

18   30(b)(6) notice where they provide a definition of technology

19   that they want to -- they -- that they have a definition of

20   what their I -- IMS or IP Multimedia System -- Subsystem

21   Technology means, and then they want a witness on topics, and

22   they use those definitions.  And that's what concerns me.

23           THE COURT:  Well, let's -- let's talk about what you

24   were talking about, and that is the portion of the 30(b)(6)

25   notice that has to do with where documents are stored or kept.
```

1    Do you have that available?  And I'm not asking you whether you

2    have it on a slide.

3            MR. MCDAVIT:  No, I want to make sure I -- I have it.

4            THE COURT:  I tell you what, while you're locating

5    that, you get the 30(b)(6) notice out, we're going to take

6    about a 10-minute recess now, and we'll come back and take that

7    up and give you a chance to locate it.

8            MR. MCDAVIT:  Yes, Your Honor.

9            LAW CLERK:  All rise.

10           (Recess.)

11           LAW CLERK:  All rise.

12           THE COURT:  Thank you.  Please be seated.

13           Mr. McDavit, if you're prepared to show me the parts

14   of the 30(b)(6) notice that have given you trouble.

15           MR. MCDAVIT:  Yes, Your Honor.  So this is -- for the

16   record, it's in Docket 107, Exhibit I, which is the full

17   30(b)(6) notice.  Let me make sure I get that.

18           Oh, perfect.  So usually -- and so we're Exhibit I,

19   again, Docket 107, this is the cover pleading -- or the cover

20   for their Notice of Deposition, and if you -- the topics that

21   they're seeking witness on, Your Honor, we don't have a problem

22   providing a witness on the topics.

23           If you go to Page 8, Mr. Werner.

24           THE COURT:  Well, the notice was served two months

25   ago.

```
 1            MR. MCDAVIT:  Yes.

 2            THE COURT:  And I understand you haven't designated

 3    someone, so...

 4            MR. MCDAVIT:  What the issue is -- are -- if they want

 5    a witness on what the identity and location of documents that

 6    we've collected to date and they're not going to seek another

 7    witness when we make another production in a couple weeks,

 8    another production two months from now, as we continue our

 9    investigation and look for documents that will -- that are

10    relevant to this case, if I'm not going to keep getting

11    30(b)(6) notices, we're not going to keep coming back here,

12    Your Honor, with more disputes that someone wasn't prepared,

13    then I don't have a problem putting up a witness.

14            THE COURT:  And did you discuss this with Plaintiff's

15    counsel?

16            MR. MCDAVIT:  Yes, Your Honor.

17            THE COURT:  And what was their response?

18            MR. MCDAVIT:  Their response was these are our topics,

19    you're not here to dictate how we do discovery, and that's fine

20    as far as it goes, Your Honor.  But we want to make sure that

21    we put up a witness for these topics to say where documents are

22    located and where we are today with our document production,

23    that -- that's what the topic is going to be about.  And if the

24    question is how are you going about searching your documents,

25    it's going to delve into privileged information, or we're going
```

1   to keep getting a 30(b)(6) request from them every two months

2   every time we make a production, then that's something we're

3   trying to guard against.

4           THE COURT:  Well, here's the way I would expect you to

5   handle that, and that is to notify the other side of what your

6   concern is and what your position will be, and -- and then

7   comply with the -- with the notice.  And if they have a problem

8   with the position you're taking, they'll let you know, and

9   we'll work it out if we need to.  But two months is too long

10  for you to have waited to designate witnesses.

11          MR. MCDAVIT:  Yes, Your Honor.

12          THE COURT:  What -- do you have -- is there anything

13  about the 30(b)(6) deposition that you want to currently bring

14  up, or if not, I'm going to direct you to -- to designate the

15  witnesses and cooperate with the Plaintiff in coming up with a

16  date, time, and place.

17          MR. MCDAVIT:  Your Honor, so I -- I would just say two

18  things in response to that.  Again, with the scope of the

19  topics that we're talking about here, if it's limited to those

20  topics as to where we are in production to date, which is how I

21  read those topics and testimony, and where we are in terms of

22  identifying and locating documents that we've provided to

23  date --

24          THE COURT:  I don't see anything in there that says to

25  date.

1          MR. MCDAVIT:  Okay.  So, Your Honor, that was -- I

2    mean, that sort of goes into my -- my concern.  Am I going to

3    put up a witness and have to put up a witness two months later?

4          THE COURT:  I don't see this -- this Topic 1, at least

5    the part that's on the screen now, as being limited to what

6    you've produced.  It is about where your documents are and what

7    kinds of documents you have.  I think the reason for the

8    Plaintiff to do this early in the case is so that they can make

9    sure that -- that they're pursuing their discovery in the best

10   fashion.  Obviously, if they wait until the end of the

11   discovery period to do this, it won't be very useful to them.

12         MR. MCDAVIT:  Yes, Your Honor.  The -- the other

13   concern, again, that we had, which goes back to our -- our --

14   the earlier slide I showed you, was when they define -- if you

15   look at Page 12 of the notice, for example, the definitions

16   that are contained in their notice do not correspond to what

17   their infringement theories are.  At least to date, we haven't

18   gotten any fidelity from Plaintiffs that the -- what they

19   define as -- if you look at Topic 4, your IP Multimedia

20   Subsystem, again, as defined by the Plaintiff, is a far ranging

21   topic.

22         And I don't know that we're going to have a witness

23   using that deposition who is going to be able to identify and

24   locate documents that are specific to that definition, unless,

25   as I think I understand what the Plaintiff is saying is that

1   their definition of IP Media Subsystem is limited to what their

2   infringement theory is as -- that's within their claim charts.

3          THE COURT:  I take it that's a defined term in the

4   notice?

5          MR. MCDAVIT:  Yes, Your Honor.  If you -- if you turn

6   to Page 4, No. 15, they say, IMS or IP Media -- Multimedia

7   Subsystem Technology means the technology commonly known by

8   that name.  Well, I don't -- I don't have someone at -- at Time

9   Warner Cable who is going to -- IMS is a -- is a broad

10  architecture that covers multiple types of technology.

11         If you look to the next page, Definition No. 3 -- 23,

12  your IMS network shall mean and refer to your networks that

13  utilize and -- and include an integrated IP Multimedia

14  Subsystem Network.  Well, the only thing that's --

15  Constellation didn't invent IMS.  The patent that's -- that

16  this relates to didn't invent IMS.  Nortel didn't invent IMS.

17  They have a theory that's in their charts.  I can prepare a

18  witness to talk about where documents are located relevant to

19  the products and the theory that's in their charts and things

20  that are reasonably related to that, but when I'm faced with

21  this definition, that was one of the reasons why we were

22  pushing back on this and saying, we need to -- we need to

23  figure out what the scope of this case is because otherwise,

24  again, we'll wind up right back here, Your Honor, and they'll

25  complain that the witness wasn't prepared.

 1          THE COURT:  Well, are you contending that the IMS

 2   network is a topic that is not reasonably calculated to lead to

 3   the discovery of admissible evidence?

 4          MR. MCDAVIT:  Yes, Your Honor, it is -- not just that

 5   topic, Your Honor, but if you look at each of their topics in

 6   the notice, Topic No. 2 talks about the identity and location

 7   of documents related to your multiple protocol label switching

 8   networks.  That's not what's charted in their -- in their

 9   contentions.

10          THE COURT:  Obviously, their discovery is not strictly

11   limited only to particular devices that they claim infringe.

12   They're entitled to find out how those operate within your

13   system, and there are -- there are issues besides infringement

14   in a case, as well.

15          MR. MCDAVIT:  Yes, Your Honor, and I -- we -- we at --

16   Timer Warner Cable recognizes that.  What we're -- what we're

17   trying to do, though -- and, again, if -- if you look at --

18   and -- and I hate to keep going back to the motion to strike,

19   but if you look at Slide 13, what we're trying to figure out is

20   what is -- you know, this is one that's specific to

21   point-to-multipoint, what are they -- what do I need to prepare

22   a witness on?  Am I preparing a witness on EPON and things

23   reasonably related to that, or am I preparing a witness on

24   point-to-multipoint, and that's the -- that's the fundamental

25   issue that -- that we have.  Same -- same thing would apply to

 1   MPLS, and we'll go to Slide 18.  I'm sorry.

 2          THE COURT:  Well, obviously, you're not limited in

 3   your obligations to particular instrumentalities that they've

 4   identified if they have set out that broader category.  I mean,

 5   your -- your obligation is to respond to what it is they're

 6   seeking discovery on in this 30(b)(6), and that's what we're

 7   talking about now, right?

 8          MR. MCDAVIT:  Yes, Your Honor.

 9          THE COURT:  And --

10          MR. MCDAVIT:  I just want to make sure when I prepare

11   a witness, that I'm preparing them on the right topics so that

12   I don't come back here again.  If they say, I want everything

13   that has to do with IMS, that is a huge topic for --

14          THE COURT:  That is a huge topic, I agree, and -- and

15   that's what your obligation is if that's what the -- what the

16   topic is in the notice.  And if you think it's too broad, then

17   let's take it up right now and see whether or not they can

18   establish that it's reasonably calculated --

19          MR. MCDAVIT:  Yes, Your Honor.  And -- and that's what

20   some of the slides that we've presented to Your Honor that are

21   within the motion to strike start to get to.  And just to be

22   clear, we have not foreclosed discovery or not provided

23   discovery on the instrumentalities and the theories that are in

24   Constellation's claim charts.  We have done that all along, and

25   we are continuing to do that.  We have never done that.

1        What we've never heard from Constellation is, is there

2   an IMS system that we use that they want more discovery on?

3   Can you identify that?  And what I'm, again, concerned about is

4   preparing a witness on your IMS systems when it's not

5   reasonably related to the theories that are in Constellation's

6   claim charts.

7        THE COURT:  All right.  Let's -- if you can put the

8   30(b)(6) notice topics back up on the screen and go to the --

9   let's take them one by -- what are the topics that you think

10  are objectionable --

11       MR. MCDAVIT:  Yes, Your Honor.

12       THE COURT:  -- and we'll take them up.

13       MR. MCDAVIT:  Again, if we go to Topic No. 2.  I can

14  provide a witness on the identity and location of documents

15  that are sufficient to show the architecture and operation

16  based on our production to date and where the repositories

17  exist at -- at Time Warner Cable that if I can identify a

18  witness that is consistent with the infringement theories that

19  are disclosed in Constellation's claim charts.

20       If you look at their definition, again, your

21  multi-protocol label switching networks, that, again, is a

22  defined term that Constellation provided.  That's on -- if you

23  start in on Page 4, MPLS network means network that utilize

24  MPLS technology.  That's not what's in Constellation's claim

25  charts.  They charted an implementation -- specific

1   implementation extension of that standardized technology, which

2   is actually defined in the next term in Paragraph 18, MPLS

3   Fast-Reroute which is a specific implementation of that

4   standard.  And I have a witness I can put up for that standard

5   who knows about -- and that's the documents that we've produced

6   that we've been searching for and continue to search for --

7   Time Warner Cable's systems that would comply with that

8   standard and meet the things that are reasonably related to the

9   claim charts that Constellation provided.

10            THE COURT:  Okay.

11            MR. MCDAVIT:  So that would be -- that would be our

12   problem with Topic No. 2.

13            THE COURT:  All right.

14            MR. MCDAVIT:  The same would occur for 3 and 4.  I'm

15   sorry, Your Honor.

16            THE COURT:  Well, let me just say that what you're

17   describing here is adequate for negotiation.  If you want to

18   tell them, this is what I'd like to do, and if they agree with

19   it, fine.  If not, you need to comply literally with the topics

20   that are set out in the notice or seek protection from the

21   Court.  And I'm giving you the opportunity now to seek that

22   protection.  And let's -- tell me again the specific notice

23   that -- topic in the notice that you believe they're not

24   entitled to make discovery on.

25            MR. MCDAVIT:  Yes, Your Honor.  Again, it -- it goes

```
 1   back to, again, Topic No. 2.  Any topic that utilizes the
 2   definitions that are not reasonably connected to the
 3   infringement theories that are laid out in Constellation's
 4   claim charts.
 5           THE COURT:  Okay.
 6           MR. MCDAVIT:  And I'm trying to avoid --
 7           THE COURT:  I understand that.  And what I'm telling
 8   you is that you're not entitled to limit their 30(b)(6)
 9   deposition to your interpretation of what's relevant which is
10   what's laid out in their claim chart.  The notice speaks for
11   itself, and you either negotiate some narrower scope of it, or
12   you comply with it.  And if -- you know, I guess your third
13   option is to challenge it now.
14           Now, to the extent that your challenge is saying you
15   will only provide a 30(b)(6) witness on the matters that are
16   set out in their infringement contentions, I'm -- I'm
17   overruling that objection.
18           What else?
19           MR. MCDAVIT:  The -- what I'd also like to bring to
20   your attention, Your Honor, which is nothing that we've
21   expressed to them, and this is on the last page of the -- of
22   the notice, Topics 8 and 9, particularly.  Constellation has
23   made the representation to us in meet and confers that they're
24   not seeking privileged information or attorney work product
25   in these topics.
```

1            Our objection to Topics 8 and 9, as we expressed to

2    them in previous meet and confers, that those topics seem to

3    call for what process attorneys went through to determine what

4    the proper documents were to -- produced in this case,

5    conversations with persons to identify places where they are --

6    documents are located.

7            THE COURT:  All right.

8            MR. MCDAVIT:  If that is not being sought in those

9    topics, then -- then that is our -- our objection to those

10   topics, and we expressed to them during one of the telephone

11   conferences we have.

12           THE COURT:  Well, let's take that up then.

13           Thank you, Mr. McDavit.

14           And I'll ask Mr. Turner or someone to respond on those

15   Topics 8 and 9.

16           MR. TURNER:  Yes, Your Honor.  On Topics 8 and 9,

17   these are asking about where the documents are located, whether

18   within Time Warner or within a third-party source where they

19   obtained the documents.  We just want to know what the source

20   of the documents are so we can conduct any follow on discovery

21   related to those documents, whether it's from somebody they say

22   is a supplier from the witness that provided the documents.

23   It's -- we're not asking for the work product.  It's typical

24   that you have the source of the documents, and you can depose

25   that person or entity about them, and that's what these topics

1   go to.

2          There's also another key issue, Your Honor.  The

3   documents that we have so far in this litigation from Time

4   Warner, which they say number in the millions, those are

5   reproduced from a prior litigation.  They have refused to tell

6   us what litigation those documents came from, what products

7   that litigation related to, or provide us any information,

8   frankly, Your Honor, about that matter.  That matter may have a

9   lot of relevant discovery, damages issues, and technical issues

10  for this case.  So we -- if their attorneys won't tell us, we

11  want to ask the witnesses what litigation do these documents

12  came from because what we got and were told was that PR 3-4(a)

13  production contained a lot of junk e-mails about scanners that

14  were in French, investment in strange entities that have

15  nothing to do with this case, and we're trying to find out

16  where are the documents relevant to the products that we've

17  accused.  Without this information in Topics 8 and 9, we can't

18  find that out, and we can't conduct the proper follow on

19  discovery.

20         THE COURT:  I think those are two different issues

21  there, Mr. Turner.

22         MR. TURNER:  Yes.

23         THE COURT:  I -- I don't think that what litigation

24  those documents had previously been produced in is relevant, at

25  least based on anything I've heard from you so far.  I think to

1    the extent that prior litigation is discoverable, that would be

2    based on your identifying a type of prior litigation, and they

3    would then have the obligation to identify it.  But the mere

4    coincidence that these documents happen to have been used in

5    some other litigation, why would that be relevant?

6         MR. TURNER:  The issue, Your Honor, is because the

7    other missing piece of information.  If we knew about the other

8    litigation, we'd know what products it related to, and,

9    therefore, we'd know what products these documents are supposed

10   to relate to.

11        Time Warner so far has refused to correlate the

12   documents that it says are PR 3-4(a) documents to the

13   particular instrumentalities we've accused, whether in the

14   claim charts or a cover pleading item, they've only done that

15   for a small subset of them, but they've said the entire

16   production is sufficient to show the operation of the accused

17   instrumentalities.

18        So right now we have no way to correlate documents to

19   accused instrumentalities which as the Nova decision that we

20   cited to Your Honor is very clear that's what's required in

21   order for a receiving party to be able to use the documents.

22        So we simply want sufficient information for us to be

23   able to use the documents, as well as Time Warner can.  And I

24   don't think we have that.  If they can provide us that without

25   using the prior litigation, that's great because we just want

1   to be able to do our analysis for this case.  But so far, we

2   just don't have it.  I think these topics will help us

3   partially get there.  It would be better if they actually did

4   the correlation because they must have done that in collecting

5   the documents.

6            THE COURT:  In districts that proceed based on

7   requests for production of documents, I think it's a lot easier

8   to require that the producing party tie the documents to a

9   particular request.  I think the disclosure requirements of the

10  Eastern District make that a more difficult obligation to

11  impose, especially in a large case where there's a lot of

12  overlap between the different claims made.  I mean, you're --

13  you're not dealing with requests for production, so in what way

14  would you have them organize the documents for you?

15           MR. TURNER:  Only according to the particular

16  instrumentalities that are accused.  So it's not correlating

17  documents to specific document requests.  The items that we've

18  requested are in our letters.  It's correlating the documents

19  to the -- what they say is sufficient to show the operation of

20  a particular accused instrumentality.

21               Let's take what's called EPON in the claim charts, for

22  example.  They acknowledge they know what EPON is.  They say

23  they produced documents related to EPON.  They say they

24  produced documents sufficient to show how their version of it

25  works.  So they should correlate the documents in their

1    production.  They're actually showing how their version works

2    versus millions of other documents that appear to be from a

3    prior litigation that may or may not relate to what we've

4    accused here.

5            So it's really just the documents -- the products

6    correlation that we're looking for here, not anything that's

7    related to a specific document request or even an interrogatory

8    response, as far as the topics, just where do those documents

9    come from.

10           THE COURT:  As far as where they come from, what --

11   what level of detail are you asking for in Topics 8 and 9?  You

12   mentioned whether they come from Time Warner or some third

13   party.  Is it as simple as that, or are you asking for file

14   cabinets or, you know, particular computer files?  What -- what

15   are you seeking?

16           MR. TURNER:  We're seeking -- the location of the

17   repository is an issue to that, Your Honor, so...

18           THE COURT:  As in Santa Fe, New Mexico, or as in, you

19   know, Bob Jones?  What -- what are you looking for?

20           MR. TURNER:  So there's one aspect the parties have

21   agreed on.  If -- if documents came from a particular custodian

22   and they're electronic documents, those are supposed to be

23   identified in most circumstances, and the parties have agreed

24   on that.

25           THE COURT:  All right.

1             MR. TURNER:  There may be documents that didn't come

2    from a particular individual but reside within some electronic

3    database that's used to store information about a particular

4    product.  Or there are network management systems that are used

5    to -- you can use to provide information about networks and

6    services.  We don't know if they actually use those network

7    management systems, but if they do, it'd be very interesting

8    because there's lots of information that can be derived from

9    them.  This topic would tell us, yes, we use this network

10   management system.  We pulled the data that we provided to you

11   out of it.  And we can say, okay, well, we -- we know very well

12   about that system.  Here's the additional data we want from

13   this.  That -- that's the sort of thing.  It's not, you know,

14   whose shoe box it came out of.  We have this sort of custodian

15   level information.  It's more about repositories and physical

16   sites, Santa Fe, New Mexico, for example, El Paso, Texas.

17            THE COURT:  All right.  Have you tried to work out an

18   agreement along these lines with defense counsel?

19            MR. TURNER:  That was part of the PR 3-4(a) discussion

20   where -- you know, what do these documents correlate to?  Most

21   of these topics are -- the reason we're pursuing them is

22   because we don't have the correlation, and it's difficult for

23   us to figure out which documents are relevant to which

24   products.  So absent the correlation, we took this approach.

25            I don't -- I haven't heard that the respondents are --

1    the Defendants are -- have a problem with providing us this

2    information.  What they're worried about is the work product of

3    what places the attorneys chose to search based on the

4    information they received.  And we're not interested in what

5    the attorneys' thoughts are.  We're interested in asking Time

6    Warner employees, when you have a question yourself about how

7    does EPON work, where do you go look?

8              THE COURT:  Uh-huh.  All right.  Mr. McDavit, does --

9    does that address the concerns that you've raised about Topics

10   8 and 9?

11             MR. MCDAVIT:  Yes, Your Honor, the representation that

12   they're not seeking attorney work product or privileged

13   information for Topics 8 and 9 does address that concern.

14             THE COURT:  Okay.  What other concerns do you have

15   about the 30(b)(6) notice?

16             MR. MCDAVIT:  Again, Your Honor, the -- the -- the

17   overarching concern that we have are those that I expressed to

18   you.  I want to make sure that I'm protecting Time Warner

19   Cable's witnesses from being dragged through multiple 30(b)(6)

20   depositions because the scope that Constellation thinks that

21   they're entitled to, which, again, seems to encompass is -- is

22   at this point very, very malleable versus what I can

23   legitimately do to prepare a witness.  And that is the --

24   that's the overarching concern that we have.

25             THE COURT:  All right.  Well, what I need from you is

1   a commitment on a time frame, when you're going to provide the

2   designation of the witnesses who will respond to the different

3   topics.

4           MR. MCDAVIT:  For the different topics, there might

5   be -- and I expect there will be multiple people, so I'll have

6   to coordinate schedules with multiple people to -- to get -- to

7   get through that.

8           THE COURT:  All right.  At this point, I -- what I'm

9   asking, how many days do you need to provide designations of

10  30(b)(6) witnesses to the Plaintiff for these different topics?

11          MR. MCDAVIT:  I need at least 30 days, Your Honor, to

12  be able to identify the right people and make sure that

13  their -- their schedules are coordinated to be able to get

14  to -- to be able to get them.  I'd ask for two months in order

15  to do this, particularly since we are continuing to produce

16  documents.

17          THE COURT:  You've had two months.

18          MR. MCDAVIT:  Yes, Your Honor.

19          THE COURT:  You're asking for -- and this 30 days

20  you're talking about, is that to produce them or to designate

21  them?

22          MR. MCDAVIT:  To produce them for a -- for a

23  deposition.  Again, there is -- as August as it is, with

24  different people being out for different reasons, and, again,

25  these are persons that might be -- we're talking about five or

1  six different persons that might have to be designated to cover

2  all these topics.

3          THE COURT:  And you will designate them in advance of

4  the deposition so they can know who they'll be deposing?

5          MR. MCDAVIT:  Yes, Your Honor.

6          THE COURT:  All right.  Mr. Turner, do you have any

7  objection to the 30-day time frame?

8          MR. TURNER:  Your Honor, as mentioned, it's been two

9  months.  It's a little difficult because we're running deep

10 into discovery.  I -- I think we can deal with it, if we deal

11 with the document production in -- in a similar fashion,

12 meaning we get the PR 3-4 documents produced and designated in

13 a timely way, then we may be able to even obviate some of these

14 topics, frankly, but, yes, I think 30 days we can work with.

15         THE COURT:  All right.  Then 30 days it will be.

16         MR. MCDAVIT:  And that's 30 days to -- just -- I want

17 to make sure I was clear, Your Honor.  It was 30 days that we

18 need to designate someone or produce?  I just want to make sure

19 I have it right on the record.

20         THE COURT:  Okay.  I understand, but I asked you that,

21 and you said --

22         MR. MCDAVIT:  Yes.

23         THE COURT:  -- produce.

24         MR. MCDAVIT:  Yes.  So 30 days to -- to -- to produce

25 the witnesses.

```
 1              THE COURT:  To be deposed.

 2              MR. MCDAVIT:  To be deposed.

 3              THE COURT:  Yeah, that means they're raising their

 4    hands at 30 days.

 5              Okay.  Now, let me see, there was -- there is a

 6    reference in the motion to interrogatories.  There's not much

 7    explanation about that.  What -- what -- what are the issues on

 8    the interrogatories, Mr. Turner?

 9              MR. TURNER:  Yes.  I'll make this brief, but it does

10    require starting in Score 1 a little bit.

11              Your Honor, there is another set of cases in Delaware.

12    Plaintiffs, along with their cohort companies that are involved

13    in those litigations in Delaware, brought a motion to transfer

14    in -- before the MDL Panel seeking to have this matter and all

15    of those matters consolidated in Delaware.

16              THE COURT:  I think we got a ruling on that this

17    morning.

18              MR. TURNER:  We did.  That motion was denied.  During

19    argument on that motion, Defendants' counsel made very clear

20    that they know very well what products are accused.  They think

21    that they're all standard technologies.  They know very well

22    what those standard technologies are, and they know precisely

23    what components are used throughout their networks.  But in

24    response to our interrogatories, they sort of threw up their

25    hands and said, we're not exactly sure what you're talking
```

1   about when you accuse our networks and services.  We can only

2   generally describe to you what products and services and

3   components we use in our networks.  And so the interrogatories

4   simply ask for all of the components that you say make up the

5   accused instrumentalities, tell us specifically by model number

6   which ones you use, and for the source code and software that's

7   on them, to the extent that's information in your possession,

8   custody, or control, provide us the identity of the source code

9   and software that they're using and the version numbers and

10   when used.  It's typical basic patent infringement litigation

11   discovery that we're seeking in those interrogatories.

12         THE COURT:  And what interrogatories are those?

13         MR. TURNER:  That is Interrogatories 1 and 2, Your

14   Honor.  We can bring them up on the overhead, I believe.

15         14, yeah.

16         So there's Interrogatory 1, the relevant network and

17   services -- services mentioned there are asking for the

18   identity of the software and source code used to implement

19   those networks and services and the date that they were put

20   into service.

21         And then Interrogatory No. 2 -- so 1 is software and

22   source code.  And 2 is the -- identify the entities involved in

23   provisioning networks.  Provisioning means providing the

24   components that are used in the network and services.  And so

25   it says, the network service component provision.

```
 1              So in their response, they say essentially there's --
 2    scroll down a bit here.  There are some set-top boxes from
 3    ARRIS, video servers from Cisco, et cetera.  We question
 4    whether this is the case somewhat, but we'll be able to
 5    investigate it if they actually provide us the model numbers of
 6    those equipment that they say they're using.  And we can
 7    investigate to what extent they're actually using them, what --
 8    how they're configured and how Time Warner Cable has configured
 9    them -- configured them, excuse me, to implement their
10    networks and services.  So it's just really a request for the
11    specific -- specificity that's required to complete an
12    infringement analysis and carry forward with discovery in the
13    case.
14              THE COURT:  So with respect to Interrogatory No. 2,
15    you're saying it lacks model numbers?
16              MR. TURNER:  Right.  The model numbers for the
17    specific routers, for example, that are used throughout their
18    networks and the other equipment that they say is used.
19              THE COURT:  And what do you say is lacking from the
20    answer to No. 1?
21              MR. TURNER:  The specific version of the source code
22    used, the name of the software and source code used and the
23    specific versions and when employed.
24              THE COURT:  And you have raised these concerns with
25    defense counsel?
```

1          MR. TURNER:  We have, the two responses.  One, Your

2    Honor has dealt with today was an attempt to limit it, based on

3    their view of what products should be accused.  I think we've

4    already addressed that.  That should -- that should no longer

5    be a limitation.

6          The second is that there's some amount of the software

7    and source code which includes configuration files and the like

8    that they themselves do not provide, and we've agreed, if you

9    don't know what's in these devices, you can just say that, I

10   don't know.  But if they do know, they need to tell us.  And we

11   think it's hard to believe they don't actually know what

12   software their very expensive networks are using, but as long

13   as they have it, they should provide it.

14         THE COURT:  Let me ask Mr. McDavit or someone from his

15   side to respond.

16         MR. MCDAVIT:  Your Honor, with respect to specific

17   model numbers that are used throughout Time Warner Cable's

18   service -- service region, what we have done is tried to

19   provide to them the companies that make the set-top boxes and

20   servers that -- that are used in those networks so that they

21   can go out and -- and talk to those companies.  I think the --

22   the idea and what we have not been providing -- or excuse me,

23   what we've not been forestalling is their ability to go out and

24   serve subpoenas on suppliers, which they -- they haven't done.

25         If they want specific model numbers, if every model

1   number of a set-top box, for example, that is made by ARRIS

2   that is used in Time Warner Cable's system, I don't -- I'm not

3   sure how that is relevant, that's information that's knowable,

4   but it's not information that is easily obtainable.  And that

5   is -- we're talking thousands of model numbers of set-top

6   boxes.

7        Same thing with -- with video servers, particularly,

8   again, with the far ranging scope of what Time Warner -- or

9   excuse me, what Constellation is purportedly asking for.

10       THE COURT:  Well, tell me what the burden is.  If your

11  objection is that it's overly burdensome, I think it's

12  incumbent on you to describe the burden for me.

13       MR. MCDAVIT:  Yes, Your Honor.  So, again, with

14  respect to model numbers of set-top boxes, there are literally

15  thousands of those that are out there.  They're not all

16  collected in one place.  And those get updated time and --

17  time -- over time as ARRIS or Cisco or Samsung introduces new

18  models of set-top boxes into their -- their lines, and they're

19  sold to Time Warner Cable.  They get deployed at different

20  times.  So without a definite time scope and without --

21       THE COURT:  Did you ask for a time scope?

22       MR. MCDAVIT:  Your Honor, what we -- what we were

23  trying to determine from Constellation is what -- why they need

24  each and every model number for this, given the amount of --

25  the amount of information that they were asking for and how

1   does that justify the burden of us going back out and finding

2   all that information.  But your direct question, I don't -- I

3   don't -- did not ask them for -- for a time scope.

4           THE COURT:  Don't you agree that they -- they would

5   need to know the model number in order to determine exactly how

6   the box operates?

7           MR. MCDAVIT:  If their representation is correct about

8   how they say their claim charts or what they have charted and

9   what their theories are, I think they would say to you -- I

10  think they'll say to the Court and the jury, if this goes to

11  trial, is that they operate exactly the same.

12          So knowing what each and every model number for is

13  used in -- in the spance (sic) of not -- Time Warner Cable's

14  networks and with the thousands -- excuse me, millions of

15  subscribers that Time Warner Cable has, it has set -- have

16  set-top boxes in their homes, the relevance of that information

17  seems very slight indeed, especially compared with the burden

18  it is to collect it.

19          THE COURT:  What is the burden?

20          MR. MCDAVIT:  The burden is going to Time Warner

21  Cable, having to have someone find out all of the set-top boxes

22  that they have purchased from each of these companies over --

23  over time and getting a current and accurate list of all the

24  set-top boxes.  That's something we do not keep around at Time

25  Warner Cable.  That's something we'd have to generate specific

1   for this litigation.  And I don't -- I don't -- I haven't heard

2   anything to say what the relevance is and how that would fit

3   into their -- their theories.

4          And the same would apply to source code.  We're

5   actively producing the source code that Time Warner Cable

6   itself has.  Not the source code that it has -- Mr. Turner

7   alluded to the source code or software that's running on our

8   vendors' boxes.  We don't have that, and we don't have any

9   visibility into that.

10          So we're going to produce the actual code.  If -- if

11   it's what is actually released to the public, that is something

12   that we can -- you know, as we get that type of information,

13   we'll amend our interrogatory responses, and we've never said

14   to Constellation that we would -- that we wouldn't amend our

15   interrogatory responses as it becomes necessary in accordance

16   with the federal and local rules.

17          THE COURT:  Well, do you have a time frame that you

18   would propose for this?

19          MR. MCDAVIT:  For Interrogatory No. 2 to -- to provide

20   all the model numbers?

21          THE COURT:  Yes.

22          MR. MCDAVIT:  I don't have a time frame, Your Honor.

23   I'd have to go back and ask them, to -- to go back and -- and

24   talk to the people at Time Warner Cable to see how long it

25   would actually take them to get that information.  I can -- I

```
 1    can have an answer to -- to Your Honor in terms of how long it

 2    would take me to get all that information in --

 3              THE COURT:  What I was talking about in time frame,

 4    and I'm sorry, I was imprecise on that.  What I meant was

 5    what -- how many years your -- this -- how many years is

 6    reasonable to discover this information about --

 7              MR. MCDAVIT:  Well, we don't have --

 8              THE COURT:  -- not how long it will take you to gather

 9    it.

10              MR. MCDAVIT:  So if we go back to the notice date,

11    which was the filing of the complaint as the start of the time

12    frame, which is the start of the time frame here, that is, you

13    know, nine months of data, I don't know standing here today,

14    Your Honor, how long it will take me to get all that

15    information to amend the response.

16              THE COURT:  Okay.  Well, and I understand that.  I was

17    only talking about a time frame.  But let me ask the Plaintiff,

18    what is a very reasonable request?  What -- do you identify a

19    time frame in your interrogatories for this information?

20              MR. TURNER:  I'd have to check, Your Honor, whether

21    it's in the interrogatory.  They haven't asked the question

22    before.  A reasonable time frame is six years back normally,

23    due to the typical statute of limitations.  Obviously, we're

24    happy to get the information in a rolling manner, meaning

25    there's stuff that they're using right now, give us that, so
```

1    that we can determine what's going on with their infringement

2    right now.  And there is some of this information that are not

3    huge quantities, such as video servers.  They have to know

4    exactly what video servers they're using.  And there's a

5    limited number of them to provide their video services to their

6    customers.

7            So they can get us the information in stages as to

8    what's relatively easier to provide versus what needs to be

9    provided later.  But, again, Your Honor, during the MDL

10   pleadings, they said they knew very well what was being used in

11   their networks, and they came from specific companies.  I don't

12   know how they made those representations if they haven't

13   already collected.

14           THE COURT:  Well, I am -- I am going to assume that

15   they will disagree with your characterization of your

16   representation to the MDL, so I'm -- I'm not going to go there.

17           MR. TURNER:  Understood, Your Honor.

18           THE COURT:  But I -- but I do think that some

19   reasonable time frame needs to be imposed on this.  Why do you

20   need this information for the entire period?

21           MR. TURNER:  Your Honor, they put these devices at

22   issue, so we just asked them in the first instance produce

23   documents about how your products work.  And they said, well,

24   we don't know anything about this, go ask our vendors.  And

25   hence, we served these interrogatories to find out who we

1   needed to ask and what we needed to ask them about.

2          So this is the tool that we would need to use to find

3   out how the products work, if, in fact, after our deposition is

4   taken -- we take that deposition we discussed, it turns out, in

5   fact, Time Warner doesn't have the information we need.  We

6   need these tools to -- because otherwise, if I serve a subpoena

7   on let's say Samsung and say, give me information about set-top

8   boxes, I'll be having a similar argument with whatever Court --

9   you know, who resolves that motion.  That's too broad.  What

10  set-top box are you talking about?

11         Time Warner is the only person in the entire world who

12  knows exactly which ones they used in their networks, and they

13  know what they brought.  They must have purchase orders and

14  things like that, so it shouldn't be too difficult for them to

15  compile.  And it's really the only way I can get the follow on

16  discovery.  If they want to stipulate that all these products

17  work the same and -- and give me information about that, I

18  heard Mr. McDavit say they operated exactly the same.

19  Obviously, we've said in our contentions we think a lot of

20  the stuff is virtually identical and relevant in respects, so

21  it may be that once they disclose all the model numbers,

22  everyone says, oh, those all work the same.  We only need

23  discovery on one.  But we need the baseline.  You know, we

24  can't make toast without bread, so we need the baseline to get

25  to the next step.

```
 1            THE COURT:  All right.  Thank you.
 2            Mr. -- Mr. McDavit, I'm assuming Time Warner is not
 3   willing to stipulate that these devices work in the same manner
 4   with respect to the -- the issues in these claims.
 5            MR. MCDAVIT:  That's -- that's correct, Your Honor.
 6            THE COURT:  Okay.  And that's the reason why I think
 7   that Time Warner does need to answer this interrogatory with
 8   model numbers so that the Plaintiff can have the opportunity to
 9   carry their burden.
10            And as far as the time scope goes, I mean, I'm --
11   if -- if you are going to take the position that these have
12   varied in material ways over time, then I -- I think that
13   they're entitled to get the model numbers for the entire period
14   at issue.  If you believe or determine that the ARRIS set-top
15   boxes have worked the same way for all relevant functions
16   during that period, then you can just produce whatever the
17   current model numbers are.  But in any event, does that make
18   sense to you?
19            MR. MCDAVIT:  Your Honor, just in terms of the period
20   at issue, again, there's no -- there's been no allegation that
21   Time Warner Cable had any notice of the patents-in-suit prior
22   to the filing of the suit in this case.  So I know Mr. Turner
23   alluded to six years back, but there's no basis in the facts of
24   this case to go that far back for any of the products.  So I
25   would say, you know, if -- if -- if we're ordered to produce as
```

 1    far back in terms of a relevant time period, it should start

 2    with the filing of suit in this case.

 3              THE COURT:  All right.  Mr. Turner, what about that?

 4              MR. TURNER:  I don't agree with that.  I'm willing to

 5    walk through with Mr. McDavit -- we can do it at a later

 6    time -- claim-by-claim and figure out which ones go how far

 7    back and when, because obviously the patent's issued on certain

 8    dates, and I don't think we need to do all that sitting here in

 9    front of Your Honor.

10              But if there's a direct infringement allegation of a

11    method claim, it doesn't matter if we put them expressly on

12    notice or if there were mark -- there was marking of products,

13    which I don't know that there was, that would be sufficient to

14    put them on notice.  So we could go six years back in certain

15    categories.

16              I'm happy to work with Mr. McDavit to figure out how

17    many years back specific patent claims go.  I don't think it's

18    something we should say, it's the date of the complaint today,

19    or we shouldn't even say it's the six years back for everything

20    today because that would also be overreaching.  There's -- I

21    think you can divide it up, and it's -- I think reasonable

22    minds -- patent law is straightforward on this issue, so

23    reasonable minds should be able to reach agreement with that.

24              THE COURT:  Mr. McDavit, do you think that you two can

25    work that out in the context of this discussion?

 1          MR. MCDAVIT:  Yes, Your Honor, and certainly we can

 2    make the effort to -- to deploy things, as Mr. Turner

 3    suggested, on a rolling basis.  To the extent right now it's

 4    easiest to know what is currently deployed, and we get that

 5    information out, and I'm willing to work with Constellation as

 6    to how far -- what the time frame scope of this response should

 7    be.

 8          THE COURT:  All right.  Well, then I'll -- I'll leave

 9    that to be worked out, but I will require that you supplement

10    your answer to include the model numbers.

11          And my inclination is to do the same thing with

12    respect to No. 1 with respect to the -- the name and version of

13    the software source code to the extent that Time Warner has

14    that information, but if you have some argument you want to

15    offer specific to that, Mr. McDavit, I'll -- I'll hear it.

16          MR. MCDAVIT:  I have no further argument on that

17    point, Your Honor.

18          THE COURT:  All right.  Then I'll direct that you

19    supplement with respect to that, as well.

20          MR. TURNER:  Your Honor, for the current versions

21    what's out there today, can we have a two-week period on that

22    supplement?  It will allow us to begin the follow on discovery,

23    if any, that we need regarding those potentially non-party

24    products, so just for the current what's in -- what's in place

25    right now.

```
 1              THE COURT:  Mr. McDavit?

 2              MR. MCDAVIT:  I don't know if I'll have it in -- in

 3   two weeks, Your Honor.  I think I can get it to them in three.

 4   In fact, we're producing the source code as we -- as we speak.

 5              THE COURT:  All right.

 6              MR. MCDAVIT:  We just didn't have a lot of

 7   information.

 8              THE COURT:  Three weeks it is.

 9              With respect to the issue about organization of the

10   documents, we got away from that, I think, while we were

11   discussing it.  But I'm -- I'm not going to require that the

12   Defendant organize their production in the manner that you're

13   talking about.  But what I will do is direct that to the extent

14   you identify specific and discrete subjects that you're not

15   able to locate within their production, but I'll direct them to

16   assist you in that.

17              And I would expect them to make reasonable efforts to

18   do so to tell you whether there simply are no documents

19   responsive to that or if there are, where -- where in the

20   production they might be found.  But I think that it's

21   appropriate to put the burden on you to -- to make reasonable

22   requests in that regard after you've done your own review of --

23   of their production.

24              MR. TURNER:  Thank you, Your Honor.

25              THE COURT:  What -- what else on your motion to
```

1    compel?

2            MR. TURNER:  I believe that addresses our motion, Your

3    Honor.

4            THE COURT:  All right.  Mr. McDavit, are there matters

5    that -- with respect to discovery that you think would be

6    productive to take up now or any clarifications with respect to

7    the rulings made so far?

8            MR. MCDAVIT:  No, Your Honor.

9            THE COURT:  All right.  Well, then, gentlemen, I thank

10   you, and we're adjourned.

11           LAW CLERK:  All rise.

12           (Hearing concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8     _____          _____
      SHELLY HOLMES                             Date
9     Official Reporter
      State of Texas No.: 7804
10    Expiration Date: 12/31/14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25